**FERRO CORPORATION, Plaintiff,**

v.

**GARRISON INDUSTRIES, INC., Defendant.**

No. 1:94–CV–2641.

United States District Court, N.D. Ohio, Eastern Division.

March 18, 1996.

Laura Kingsley Hong, Thomas Gerard Kovach, Squire, Sanders & Dempsey, Cleveland, OH, for Ferro Corporation.

Suellen Oswald, Duvin, Cahn & Hutton, Cleveland, OH, D.E. Dismukes, William D. Toney, Randall G. Vaughan, Kevin P. Doyle, Pray, Walker, Jackman, Williamson & Marlar, Tulsa, OK, for Garrison Industries, Inc.

### OPINION & ORDER

O'MALLEY, District Judge.

Currently pending before the Court are the following motions: (1) motion by defendant Garrison Industries, Inc. ("Garrison") to modify this Court's Orders dated May 5, 1995 and May 11, 1995 (docket no. 91); and (2) motion by plaintiff Ferro Corporation ("Ferro") to vacate the arbitrators' award in related proceedings (docket no. 76). For the reasons stated below, Garrison's motion to modify the Court's earlier Orders (docket no. 91) is **DENIED** and Ferro's motion to vacate the arbitrator's award (docket no. 76) is **GRANTED.**

**The parties are directed to submit to the Court a case management plan regarding future proceedings in this case, as outlined in Section IV below.**

### I. Background.

Because the procedural history of this case is so tortured, the Court provides the following synopsis as background necessary to understand the Court's present rulings. Although this synopsis repeats some language used in prior opinions in this case, the following is helpful as a complete recapitulation.

This action involves a contract between plaintiff Ferro Corporation ("Ferro") and defendant Garrison Industries ("Garrison"). The contract is referred to by the parties and the Court as the Custom Manufacturing Agreement ("CMA"). In the CMA, Garrison agreed to manufacture for Ferro a Ferro-developed product known as PyroChek LM, which was intended for use as a flame retardant additive to certain thermoplastics. Garrison promised to manufacture at least 1.5 million pounds of PyroChek LM per year, and up to 3 million pounds per year. In turn, Ferro agreed to: (1) pay Garrison $250,000 up front for purchase of and upgrade to Garrison's manufacturing equipment, so that Garrison could manufacture PyroChek LM; and (2) accept and pay for (at the rate of 90 cents per pound) the PyroChek LM that Garrison produced. The CMA had an initial term of two years, and contained a standard arbitration clause drafted by Ferro.

The parties executed the CMA on March 17, 1992, agreeing that Garrison would begin production of PyroChek LM as soon as Garrison completed certain upgrades to its facilities as contemplated by the contract. Garrison did not begin to produce PyroChek LM

until May 28, 1992, however, because in addition to spending time making the upgrades agreed to by the parties, Garrison needed time and money to repair damage to its facilities caused by a tornado that passed across its property on May 9, 1992.

During the next several months, Garrison continued to produce a quantity of PyroChek LM as it experimented with various chemical production processes. Although the product Garrison manufactured did not always meet Ferro's specifications, and although the quantity produced fell short of the contract minimums, Ferro purchased all of the product Garrison produced through March 26, 1993—which amounted to about 701,800 pounds of product. On March 26, 1993, however, Ferro ordered Garrison to cease production of PyroChek LM. Ferro later told Garrison it did not intend to purchase any more of the PyroChek LM that Garrison might produce, and Ferro sent a contract termination letter to Garrison in December of 1993.

Despite Ferro's desire to discontinue its relationship with Garrison, Garrison sought payment from Ferro for the balance of the roughly 2.2 million pounds of PyroChek LM that Ferro had promised it would buy from Garrison. Ferro refused, so, on April 25, 1994, Garrison invoked the arbitration clause of the CMA. Ferro responded on May 15, 1994, with a counterclaim in arbitration. The arbitration was scheduled for January 9, 1995. Just before the arbitration was to begin, however, the parties engaged in a whirlwind of procedural moves and countermoves.

On December 2, 1994, Ferro filed an action in state court seeking to: (1) enjoin the arbitration; and (2) have the court rescind the contract because Garrison had fraudulently induced Ferro to enter into the CMA. On the same date, Ferro filed with the arbitration panel a motion to stay proceedings pending the litigation. On December 20, 1994, the arbitration panel denied the motion to stay the arbitration proceedings. Ferro immediately sought to stay the arbitration proceedings anyway, by filing in its state court action a motion for temporary restraining order to stay the arbitration. The state court set the matter for hearing on December 22, 1994.

On December 21, 1994, before the state court had ruled on Ferro's motion for temporary restraining order, Garrison removed the action to this Court. Ferro's counsel appeared in this Court's waiting room on December 21, 1994, seeking an emergency meeting with the Court and requesting immediate issuance of a temporary restraining order, so that Ferro's counsel could avoid preparing for the impending arbitration. Although the undersigned was not in chambers, she communicated through her clerk to Ferro's counsel (after being reached by telephone) that the Court declined to rule on the motion immediately, but that the Court *would* hold a hearing on the motion before the arbitration was scheduled to commence. Ferro's counsel, either refusing or unable to understand this ruling, then went to Judge Ann Aldrich, who was the "emergency/miscellaneous judge" on duty at that time. Ferro's counsel asked Judge Aldrich to immediately issue a temporary restraining order, on the ground that this Court was "unavailable" to consider Ferro's request. Judge Aldrich's clerk learned from this chambers what had already transpired, however, and she properly refused to present the matter to Judge Aldrich. The next day, on December 22, 1994, the Court set a hearing on the motion for temporary restraining order for January 5, 1995, and consolidated the hearing to include a hearing on Ferro's request for preliminary injunctive relief. Meanwhile, the state court—apparently unaware that the case had been removed to this Court—issued the requested temporary restraining order on December 22, 1994. Of course, the state court no longer had jurisdiction over the dispute, so the state court's order was null and void. Nonetheless, Ferro sent a copy of the void order to the arbitration panel.[1]

1. It is unclear whether Ferro *knew* Garrison had removed the lawsuit to federal court when Ferro sent a copy of the state court's restraining order to the arbitration panel. It *is* clear, however, that after Ferro *learned* Garrison had removed the action and thus that the state court order was void, Ferro did not then reveal this fact to the arbitration panel.

On December 28, 1994, Garrison moved this Court to refer all the issues raised in the complaint (including Ferro's fraudulent inducement claim) to arbitration.[2] Essentially, Garrison opposed Ferro's request for an injunction and sought an order declaring that the question of whether it had fraudulently induced Ferro to enter the CMA was an issue that only the arbitrators could resolve. The Court ordered that the issues raised in Garrison's motion would also be heard at the January 5, 1995 hearing.

At the time of the January 5, 1995 hearing, Ferro had asserted only one basis for its claim of fraudulent inducement: Ferro claimed it was induced into entering into the CMA by Garrison's false representation that Garrison was capable of manufacturing for Ferro the minimum quantities of PyroChek LM using a specific, agreed-upon chemical manufacturing process. Later, Ferro added a second basis for its claim of fraudulent inducement: Ferro claimed it was induced into entering into the CMA by Garrison's false representation that Garrison sustained only minor, cosmetic damage from the tornado. These two claims are referred to, respectively, below as the "production fraud claim" and the "tornado fraud claim."

After conducting the scheduled hearing, this Court declined the parties' requests for declaratory or injunctive relief and set the case for trial. The grounds for this Court's Order denying the relief sought were set forth at some length, on the record, during the Court's January 5, 1995 hearing. Regarding Garrison's request for an Order declaring that the fraudulent inducement claim was for the arbitrators, not the Court, to decide, the Court denied the request: "the issue of whether Garrison fraudulently induced Ferro to enter the agreement between the parties ... is non-arbitrable under Ohio law, and thus [this Court] retains jurisdiction over that claim." Order at 2 (Jan. 6, 1995); *see* Hearing Tr. at 3–4 (Jan. 5, 1995) (docket no. 80) (outlining Court's reasoning). Nonetheless, the Court declined to stay the arbitration. Regarding Ferro's motion for an order restraining the arbitration from going forward, the Court found, among other things, that Ferro had failed to establish a likelihood of success on the merits of its production fraud claim. The Court also noted that

> the [production] fraudulent inducement claim is belated in that both parties had previously invoked the arbitration clause, the arbitration has begun and was under way, [and] the arbitration panel has had an opportunity to have not only an initial hearing but to set a more detailed hearing on the question of liability.... [U]nder these circumstances, ... the public interest is more in favor of allowing the arbitration to proceed, especially an arbitration that the parties clearly agreed to with such broad terms, and an arbitration under an arbitration clause that the plaintiff does not dispute that it itself drafted.

Hearing Tr. at 8–9 (Jan. 5, 1995). The Court thus denied the motion for temporary restraining order, with a small caveat:

> To the extent, and solely to the extent, that Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction can be construed to seek an Order from this Court enjoining the arbitration panel from resolving the ultimate question of whether the contract at issue in this case has been fraudulently induced, Plaintiff's Motion is **GRANTED**. To be clear, the Court adds that the arbitration panel may hear any and all evidence that it deems appropriate concerning the issues before it, even if that evidence would otherwise be relevant to the claim of fraudulent inducement, and may make all factual determinations it deems relevant to its decision-making process on all arbitrable issues. ·

Order at 2 (Jan. 6, 1995). Following the issuance of this Order, the arbitration panel re-set the pending arbitration to begin on January 10, 1995. The Court set the trial of Ferro's production fraud claim for April 18, 1995.

Over Ferro's objection, the arbitration panel chose to bifurcate its proceedings, separating its hearings into liability and damages phases. The arbitration panel heard

---

2. Garrison also moved for a change of venue to Arkansas, which this Court denied.

evidence going to liability on January 10–12, 1995. At that hearing, Garrison, for the first time, raised the issue of the tornado damage suffered by its manufacturing facility as a defense to the claim that it unreasonably delayed its production of PyroChek LM. Specifically, Garrison claimed that the March 9, 1992 tornado damage had been so extensive that it was unable to begin the upgrades to its facility necessary to manufacture Pyro-Chek LM until late April or early May, 1992.

On February 27, 1995, the panel issued its report and found that "Ferro is liable to Garrison for an amount to be determined at a subsequent hearing." AAA Decision at 12 (Feb. 27, 1995). The parties then began to prepare for the arbitration hearing on damages. Ferro requested, and belatedly received, discovery from Garrison regarding the tornado. It was only then that Ferro learned the great extent of the physical damage Garrison had suffered from the tornado. The tornado damage to Garrison's plant was so severe that Ferro determined it had a second basis for its claim of fraudulent inducement—that is, it was induced into entering into the CMA by Garrison's false and misleading representation that Garrison sustained only minor, cosmetic damage from the tornado. Accordingly, Ferro amended its complaint in this case on April 5, 1995, to state its "tornado fraud claim."

As the Court's trial date of April 18, 1995 approached, it became clear that the related arbitration proceedings were not going to be concluded by that date. On April 10, 1995, Garrison moved to continue the trial until after the arbitrators had entered a damages award. The Court granted the motion in part, stating:

in the interests of conservation of judicial resources and in giving appropriate deference to the integrity of the arbitration process, a stay of that part of the trial concerning whether the parties agreed in the contract to a specific manufacturing process [the production fraud claim] is appropriate. However, the trial will go forward as scheduled concerning Ferro's claim of fraudulent inducement through misrepresentation of tornado damage.

Order at 2–3 (April 18, 1995).

Until that point in time, the arbitration and litigation were essentially moving forward seriatim: the litigation was stayed pending completion of the arbitration. The Court had made its decision to stay the litigation in deference to the arbitration panel's jurisdiction and "because it found that the ongoing arbitration might have an impact upon, and indeed, even be binding upon, its decision with respect to the [production fraud] claim." Order at 3 (May 11, 1995) (explaining the Court's April 18, 1995 decision). Other reasons the Court had for staying the litigation of the production fraud claim included: (1) if the Court found against Ferro on its production fraud claim, which appeared weak on the merits, the arbitration would have to occur anyway; (2) the fact findings of the arbitration panel could conceivably moot the issues left for this Court to decide; and (3) it appeared the arbitration might resolve the entire dispute expeditiously.

Accordingly, as of April 18, 1995, the arbitration and litigation moved forward partially in parallel: the Court agreed to hear evidence going to the tornado fraud claim, while the parties continued to present to the arbitrators evidence regarding the production fraud claim. Because the factual issues surrounding the tornado fraud claim were before *only* this Court, and not the arbitration panel, this Court was not concerned that going forward on the tornado fraud claim would interfere with the arbitration panel's jurisdiction. Thus, the Court determined that, at the April 18, 1995 trial, it would hear evidence going only to the tornado claim; the Court would hear evidence regarding the production fraud claim at some later date, if necessary, after the arbitration panel had concluded its proceedings.

Beginning on April 18, 1995, the Court held a three day bench trial on the tornado fraud claim. To its own surprise, the Court was presented with evidence showing clearly and convincingly that Garrison had made material and intentional misrepresentations to Ferro regarding the tornado damage, and

that the tornado fraud claim was well-taken. *See generally* Order at 3–4 (May 11, 1995). The Court announced certain of its findings and conclusions from the bench on April 20, 1995, and then asked for briefs going to the question of the appropriate remedy. Specifically, the Court referred the parties to various provisions of the Restatement (Second) of Contracts and asked the parties to address the applicability, if any, of these provisions to this dispute. As the Court made clear to the parties at the time, the Court was unsure whether the remedy to which Ferro was entitled as relief for Garrison's "tornado fraud" was affected by circumstances that occurred during the year *after* Garrison's misrepresentation, when the parties were accepting each other's performances under the CMA. Tr. at 367–388 (Apr. 20, 1995).

While the Court was still considering what remedy was appropriate, the arbitration panel announced it would hold its hearing on damages on May 8, 1995. Knowing that the Court's decision regarding the appropriate remedy on the tornado fraud claim could affect the arbitration panel's jurisdiction, the parties contacted the Court to ask when it might rule on the tornado fraud remedy issue. In an effort to help the parties, the Court issued its May 5, 1995 Order, setting out the relief to which Ferro was entitled without explaining its conclusion.

Because the Court's May 5, 1995 Order and April 20, 1995 ruling clearly reflected the Court's conclusion that Garrison had indeed fraudulently induced Ferro to enter into the CMA, Ferro refused to participate in the May 8, 1995 damages hearing before the arbitration panel. Ferro took the position that the arbitrators lacked the authority to act and made it clear to the panel that it would not voluntarily abide by *any* decision the arbitrators reached. Ferro also refused to attend the damages hearing, indicating that it feared it might not waive a challenge to the arbitrators' jurisdiction by doing so. Six days later, on May 11, 1995, the Court issued a more full opinion detailing the reasoning behind its April 20, 1995, ruling and May 5, 1995 order. Meanwhile, on May 9, 1995, having seen the Court's May 5, 1995 Order, the arbitration panel issued its final

award. The arbitrators affirmed that Ferro was liable to Garrison and awarded damages in excess of $1.6 million.

With its pending motion, Garrison seeks to have the Court modify (and essentially reverse) its May 5, 1995 and May 11, 1995 Orders, in which the Court found in Ferro's favor on the tornado fraud claim. Conversely, Ferro's pending motion asks this Court to vacate the arbitrators' award. Against this background, the Court now turns to the pending motions themselves.

## II. Garrison's Motion to Modify the Court's Earlier Orders.

To repeat briefly, in April of 1995, this Court held a trial only on the issue of whether Garrison had fraudulently induced Ferro to enter into a contract called the Custom Manufacturing Agreement ("CMA"), through misrepresentation of the extent of tornado damage to Garrison's manufacturing facilities. After the evidence was submitted, the Court concluded that Garrison had intentionally failed to disclose facts material to Ferro's decision to enter into the CMA. The Court so indicated from the bench at the close of trial; however, the Court did not immediately reach any conclusion regarding the proper remedy, and asked for briefs on that issue. Thereafter, the Court began to write a formal opinion explaining its rationale and addressing the issue of the appropriate remedy.

At the same time as the parties were in litigation before the Court, they were also arbitrating cross-claims of breach of contract. Given that the Court's decision could obviously affect the arbitration proceedings, the parties were in frequent contact with the Court, hoping to learn the Court's decision regarding remedies. To accommodate the parties, the Court issued an Order dated May 5, 1995, just before the arbitration panel was to convene, simply listing the remedies it had decided to grant to Ferro. The May 5, 1995 Order, however, did not explain the Court's rationale, as the Court was still drafting a full opinion. On May 11, 1995, the Court issued its full opinion, restating and explaining the grant of remedies listed in the May 5, 1995 Order.

Because the May 5 and May 11 Orders did not address all of the issues raised by the parties, the Court identified those Orders as not final or appealable. As the Sixth Circuit has indicated repeatedly, the period during which the parties have an opportunity to review these Orders *through appeal* does not begin to run until this Court issues an Order entering final judgment, pursuant to Fed. R.Civ.P. 58.

With the instant motion, Garrison asks the Court to review and modify its May 5 and May 11 Orders, on the basis of additional evidence not introduced at trial. Ferro responds that such a review is not contemplated under any of the Rules of Civil Procedure. While it would most likely be justified in doing so, the Court declines to avoid examination of Garrison's additional evidence on procedural grounds. Instead, the Court, under its equitable powers, accepts Garrison's invitation to review again all of the evidence presented, including the "new" evidence referred to in its motion to modify.

Having made that review, the Court declines to modify or amend its earlier Orders. In its motion, Garrison first argues that newly discovered evidence shows the tornado did not delay Garrison's production of PyroChek LM, and Ferro was *not* misled into entering the CMA. Garrison also argues that: (1) it reasonably believed neither its financial strength nor its mechanical readiness would be at issue at trial; (2) the Court's findings regarding the extent of the tornado damage are wrong; (3) the Court applied the wrong legal standard in assessing the materiality of Garrison's statements and omissions; and (4) the Court should change its factual findings to make them consistent with the factual findings of the arbitration panel.

■ The Court finds none of these arguments persuasive. First, having re-examined the entire record, the new evidence presented does not convince this Court it should change any of its findings of fact. The new evidence presented is not all that "new," as it largely duplicates in documentary form testimony adduced by Garrison. Second, Garri-

son's statement that it reasonably believed its financial strength and its mechanical readiness would not be issues at trial is belied by the trial record and is disingenuous. Indeed, it is fair to say that the effect of the tornado on Garrison's ability to perform is evidenced *only* by the tornado's impact on Garrison's financial strength and mechanical readiness. Third, the Court finds that: (a) its earlier determinations regarding the critical extent of tornado damage are amply supported by the necessary weight of the evidence (despite any "counterweight" now supplied by Garrison's "new" evidence and recently produced affidavits); and (b) it did not apply the wrong legal standard in assessing the materiality of Garrison's statements and omissions. Finally, the Court will not change its carefully reached factual findings to make them consistent with the findings of the arbitration panel. The issues before this Court were more narrowly focused than the issues in front of the arbitrators, suggesting this Court made a closer examination than the arbitrators of certain key facts. Also, certain evidence before this Court was simply not available to the arbitrators, and it cannot be ignored that Ferro did not fully participate in adducing evidence before the panel during phase two of its proceedings. Garrison has not given this Court any sufficient basis to modify its findings of fact or conclusions of law.[3] Accordingly, Garrison's motion that this Court amend its earlier Orders is **DENIED.**

### III. Motion to Vacate Arbitrator's Award.

Simultaneous with the parties' prosecution of this case, the parties pursued arbitration of cross-claims of breach of the CMA. As noted, Ferro asked that this Court enjoin the arbitration while this litigation proceeded, and this Court denied that request, stating that arbitration of the underlying breach of contract claims could continue while the parties litigated the question of whether the contract itself had been fraudulently induced.

---

**3.** Indeed, a full review of the materials provided by the parties leads the Court to conclude that Garrison, through its counsel, misrepresented to the arbitrators the nature of the evidence adduced before this Court.

■ Following the trial on the tornado fraud claim, in what it had hoped were clear terms, this Court concluded that Garrison did fraudulently induce Ferro to enter into the CMA. *See* Order at 5–6 (May 11, 1995) (finding Ferro showed all necessary elements of a claim of fraudulent inducement). Fraudulent inducement is a valid basis for finding the contract void ab initio, and ordering rescission. *INA Underwriters Ins. Co. v. D.H. Forde & Co.*, 630 F.Supp. 76, 77 (W.D.N.Y. 1985); *McMechan v. Lewis*, 1993 WL 119812 at *2, 1993 Ohio App. LEXIS 2109 at *5 (Ohio Ct.App. April 19, 1993); *Legue v. Bill Swad Chevrolet, Inc.*, 1992 WL 208922 at *3, 1992 Ohio App. LEXIS 4281 at *8–*10 (Ohio Ct.App. Aug. 20, 1992). Based on the equities of the case, however, the Court did not order that the parties return to each other all the fruits of their performances from the commencement of the CMA on March 17, 1992. Rather, the Court ordered that the parties return to the status quo as of March 26, 1993, the point in time after which the parties had both *ceased* performance and before which both had *accepted* the other's performance.

Specifically, the Court found that Ferro was entitled to the following relief:

1. The CMA is rescinded to the extent not performed (i.e., as of March 26, 1993);

2. Rescission as to that portion of the CMA performed prior to March 26, 1993 (i.e., contractual performance relating to product produced by Garrison and received and paid for by Ferro) is inappropriate; and

3. Ferro is not entitled to the return of the initial $250,000 paid to Garrison upon execution of the CMA.

Order at 5 (May 11, 1995). By this the Court meant that: (1) the CMA was null and void *ab initio*, because Garrison fraudulently induced Ferro to enter into the CMA; (2) each party could therefore *avoid its performance* under the CMA as of and subsequent to March 26, 1993; however (3) equity demanded that neither party could avoid its performance under the contract, *through restitution*, prior to March 26, 1993, even though the contract was void *ab initio*, because both had proceeded to accept some level of performance thereunder.

Despite having reached the legal conclusion that the CMA was void *ab initio*, the Court did not *explicitly* state that, because the arbitration panel no longer had jurisdiction to determine the parties' breach of contract claims, the panel should cease proceedings.[4] The Court's silence was not a failure of inadvertence: the Court believed that, having already engaged in substantial arbitration proceedings, the arbitrators should be given the chance to assess their own jurisdiction, and possibly to make conditional findings. Thus, this Court expected that, in light of the Court's May 5, 1993 ruling (and without the Court having to actually enjoin the arbitration proceedings), the panel would assess the limits placed on its jurisdiction and structure any further ruling it issued accordingly. Specifically, the Court assumed that the arbitration panel would either: (1) refuse to exercise continuing jurisdiction and simply decline to assess damages, despite having found a breach of contract during the liability phase of its proceedings; or (2) assess the measure of damages chargeable to the breach of contract it had found earlier, but conclude that it was without authority to render an *award* of those damages to Garrison.[5]

---

4. The arbitration panel's jurisdiction failed, of course, because the arbitration clause ostensibly empowering the panel was contained within a void contract. *Williams v. Aetna Finance Co.*, 65 Ohio St.3d 1203, 1204, 602 N.E.2d 246 (1992) (affirming lower court's ruling that "[b]ecause appellee's complaint challenges the existence of a contract between the parties ..., the arbitration clause in the loan agreement may not be enforced until the question of the existence of the contract is resolved"); *Rolling v. Ohio State Home Servs., Inc.*, 1993 WL 261568 at *2, 1993

Ohio App. LEXIS 3585 at *6–*8 (Ohio Ct.App. July 14, 1993) (a contract dispute "should not be submitted to arbitration until the court first determines whether the contract is valid and enforceable").

5. The Court thought the arbitrators might pursue the latter option to avoid the need to reconvene to determine damages, in case this Court's May 5, 1995 Order was eventually reversed on appeal.

The arbitration panel did neither. Instead, the arbitration panel (at Garrison's urging) distorted this Court's ruling to say that the CMA was void only after March 26, 1993, and was *not* void *ab initio*. The panel essentially determined that: (1) the contract was vital between March 17, 1992 and March 26, 1993; (2) this vitality gave the panel jurisdiction to decide whether there was a breach of the contract during that period (a determination the panel had *not* made during the liability phase of its proceedings); and (3) the panel could then assess damages stemming from any breach of the contract that occurred during that period. The panel went even further, determining that it also had jurisdiction to assess *extra-contractual* damages which occurred after March 26, 1993, even though the CMA was (under the panel's own interpretation of this Court's Order) then void. Having found some basis for jurisdiction, the panel went on to finally conclude that Ferro breached the CMA and Garrison did not, and the panel awarded Garrison damages in the amount of $1.6 million.

■ With the instant motion, Ferro asks the Court to vacate the arbitration panel's award. It is clear that Ferro's motion is well-taken. Simply, the panel's conclusion that its "subject matter jurisdiction was limited but was not precluded by reason of the district court's order" was wrong. Arbitrator's Final Award at 5 (May 9, 1995). With its Orders dated May 5 and May 11, this Court *voided* the CMA and every obligation remaining thereunder. The Court did not *terminate* the CMA as of March 26, 1993, so that the CMA retained some vitality between the time of its inception and that date; the Court declared the CMA a nullity because it was procured in part through Garrison's intentional misrepresentation. "Rescission is not merely a termination of the contract; it is an annulment of the contract." *Mid–America Acceptance Co. v. Lightle*, 63 Ohio App.3d 590, 599, 579 N.E.2d 721 (Ohio Ct. App.1989).

Having rescinded the contract, this Court granted the remedy of partial restitution. Based on the equities of the case, the Court decreed the parties could avoid the entire unperformed portion of the CMA, but could not avoid through restitution those obligations already performed. The remedy of partial restitution did not mean the CMA was only annulled in part. It was annulled entirely, from its inception. Given that this Court declared the CMA void *ab initio,* none of the provisions contained within it—including the arbitration clause—remained valid or enforceable. As such, any award of damages by the arbitration panel was grounded on a lifeless arbitration clause. Thus, the panel's award was without effect and must be vacated.

■ The Court concedes that the phrasing in its Orders dated May 5 and May 11, 1995—rescinding the CMA "to the extent not performed," without actually using the phrase "void *ab initio*"—allowed the panel some room to believe that the Court had not voided the CMA completely. It is absolutely clear to this Court, however, that the arbitration panel illegitimately stretched its reach to find jurisdiction and to find a basis upon which to award Garrison damages. For example, in light of this Court's Orders, the panel determined that it would limit [its] damage hearing to the following:

a) Damages *outside of the CMA* subsequent to March 26, 1993.

b) Damages based on the CMA prior to its recision [sic] of March 26, 1993 and subsequent to its execution on March 17, 1992.

Arbitrator's Final Award at 2 (May 9, 1995) (emphasis added). Even assuming the panel could come to the conclusion it had jurisdiction to assess damages as reflected in clause (b) in good faith, there can be no question that the panel had no authority to award damages *outside of the contract,* as contemplated in clause (a). The CMA itself stated that "[a]ll controversies and claims *arising out of or relating to this Agreement,* or the breach of this Agreement, shall be settled by arbitration...." CMA at 15 (emphasis added). That an arbitration panel's power is limited to resolving only those disputes over which the parties give it authority is fundamental: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not

agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). By awarding damages "outside of the contract," the panel exceeded its jurisdiction under any understanding of this Court's Orders, legitimate or otherwise.

Moreover, the panel had earlier decided, during the liability phase of the arbitration, that any breach of the CMA by Ferro had occurred *after* March 23, 1993. *See* Arbitration Findings of Fact at 8–10 (Feb. 27, 1995) (effectively finding that Ferro performed all of its obligations up to March 23, 1993). Thus, the panel's damages award could not have been based on breach of the CMA "prior to its recision [sic] of March 26, 1993 and subsequent to its execution on March 17, 1992;" rather, the panel's award to Garrison of $1.6 million must have been for "damages *outside of the CMA* subsequent to March 26, 1993." Essentially, then, the arbitration panel found it had jurisdiction based on a contract that "terminated" on March 26, 1993, but went on to grant damages that occurred *after* the contract "terminated." The tortured path of this decision makes it quite clear to the Court that the panel had some level of impermissible bias toward Ferro.[6]

Finally, the Court notes that several of the panel's findings of fact are directly contrary to the facts found by this Court to have been proved by clear and convincing evidence. Without going so far as to say that the panel had "no rational basis" for its findings, the Court believes that the panel's factual findings are yet another indicator that it was impermissibly biased against Ferro. Apparently, this bias led the panel to exceed its authority.

It is unfortunate that this Court is forced to vacate the work done by the arbitration panel. In retrospect, this case would have been far less complex if this Court had not been so deferential to the arbitrators and had

simply stayed the arbitration pending litigation of the fraudulent inducement claims. The Court, however, cannot take all the blame. A review of the transcript of the arbitration proceedings reveals that the arbitrators might well have reached a better-reasoned decision if Ferro's counsel had been less discourteous, and if Garrison's counsel had been more forthcoming. And, there is no doubt that Ferro's failure to seek the assistance of this or any Court until long after both parties had sought the assistance of the arbitrators hurt Ferro's ability to belatedly dictate the forum for resolution of this dispute. In any event, it still appears to this Court that its decisions were appropriate when made, which is the only viable measure.

In sum, the Court finds that the arbitration panel was without jurisdiction to grant any award of damages to Garrison because the contract empowering the panel was void. Accordingly, Ferro's motion to vacate the arbitrators' award is **GRANTED.**

### IV. Further Proceedings.

The parties are directed to provide to the Court, within 21 days of the date of this Order, a proposed case management plan. This plan should state the issues remaining for this Court to resolve, and should suggest procedures for doing so. The plan should also include proposed deadlines for any further discovery or dispositive motions believed necessary. This plan should be a joint submission, formulated after a meeting of counsel.

**IT IS SO ORDERED.**

---

6. The panel's bias might have been based on: (1) Ferro's having repeatedly attempted to stay the arbitration proceedings; (2) Ferro's contention that the panel's earlier efforts during the liability phase of the arbitration had been wasted, given this Court's May 5, 1995 Order; (3) Ferro's promise (which it kept) that it would walk out of the damages phase of the arbitration hearing, rather than risk waiving its right to challenge the panel's jurisdiction by attending the hearing; or (4) a belief that Ferro's counsel showed insufficient respect for or deference to the panel throughout the arbitration proceedings.